CASE NOT YET SCHEDULED FOR ORAL ARGUMENT

CASE NO. 16-1121

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

STATE OF DELAWARE,
Petitioner,

v.

SURFACE TRANSPORTATION BOARD and the
UNITED STATES OF AMERICA,
Respondent.
_____

**BRIEF OF PETITIONER STATE OF DELAWARE**
_____

Review of STB Order; Petition of Norfolk Southern Railway Company,
STB Finance Docket No. 35949 (Service Date Feb. 22, 2016)
_____

W. Eric Pilsk
epilsk@kaplankirsch.com
Allison I. Fultz
afultz@kaplankirsch.com
Steven L. Osit
sosit@kaplankirsch.com
KAPLAN, KIRSCH & ROCKWELL, LLP
1001 Connecticut Avenue, NW
Washington, D.C.  20036
Telephone:  (202) 955-5600
Facsimile:  (202) 955-5616

Counsel to State of Delaware

Jennifer R. Noel
Jennifer.Noel@state.de.us
Deputy Attorney General
DELAWARE DEPARTMENT OF
    JUSTICE
Carvel State Building
820 N. French Street, SLC C600
Wilmington, DE 19801
(302) 577-8400

## CERTIFICATE OF PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Petitioner certifies as follows:

1. Parties and Amici:  The Petitioner is the State of Delaware. The Respondents are the Surface Transportation Board (Board) and the United States of America. The administrative proceeding resulting in the ruling under review was initiated by the Norfolk Southern Railway Company. CSX Transportation, Inc. and the Association of American Railroads also participated in support of the Norfolk Southern Railway Company.

2. Rulings Under Review:  The ruling under review is an Order of the Board finding Delaware Senate Bill 135, codified at Del. Code Ann. tit. 21, § 8501–8505, preempted by 49 U.S.C. § 10501(b). *Norfolk S. Rwy. Co. – Declaratory Order Proceeding*, STB Finance Docket No. 35949 (Service Date Feb. 25, 2016) (Joint Appendix 86–91). The Board's Order was issued on February 25, 2016.

3. Related Cases:  This case has not previously been before this Court or any other court.

_____ /S/ _____

W. Eric Pilsk
epilsk@kaplankirsch.com
Allison I. Fultz
afultz@kaplankirsch.com
Steven L. Osit
sosit@kaplankirsch.com
KAPLAN, KIRSCH & ROCKWELL, LLP
1001 Connecticut Avenue, NW
Washington, D.C.  20036
Telephone:  (202) 955-5600
Facsimile:  (202) 955-5616

Counsel to State of Delaware

Jennifer R. Noel
Jennifer.Noel@state.de.us
Deputy Attorney General
DELAWARE DEPARTMENT OF
   JUSTICE
Carvel State Building
820 N. French Street, SLC C600
Wilmington, DE 19801
(302) 577-8400

## STATEMENT REGARDING ADDENDUM OF
## STATUTES AND REGULATIONS

Pursuant to Circuit Rule 28(a)(5), copies of the following pertinent statutes

are set forth in the Addendum annexed hereto:

| Document | Page |
|---|---|

| Document | Page |
|---|---|
| 5 U.S.C. § 556(d) | 1 |
| 5 U.S.C. § 706 | 2 |
| 49 U.S.C. § 10102(9) | 3 |
| 49 U.S.C. § 10501(b) | 3 |
| Del. Code Ann. tit. 21, § 8501 | 4 |
| Del. Code Ann. tit. 21, § 8502 | 4 |
| Del. Code Ann. tit. 21, § 8503 | 5 |
| Del. Code Ann. tit. 21, § 8504 | 5 |
| Del. Code Ann. tit. 21, § 8505 | 6 |

# TABLE OF CONTENTS

CERTIFICATE OF PARTIES, RULINGS UNDER
REVIEW, AND RELATED CASES ......................................................... ii

STATEMENT REGARDING ADDENDUM OF
STATUTES AND REGULATIONS ........................................................ iii

TABLE OF CONTENTS ......................................................................... iv

TABLE OF AUTHORITIES .................................................................. vii

GLOSSARY OF ABBREVIATIONS ...................................................... xi

JURISDICTIONAL STATEMENT ...........................................................1

    A.  The Board's Jurisdiction ...........................................................1

    B.  This Court's Jurisdiction ...........................................................2

STATEMENT OF ISSUES .........................................................................2

STATEMENT OF THE CASE......................................................................3

STATEMENT OF THE FACTS AND REGULATORY FRAMEWORK .............4

    A.  Statutory Framework and Federal Preemption .......................4

    B.  Delaware Senate Bill 135..........................................................6

    C.  The STB Proceeding ..................................................................8

        1.    The NSR Petition for Declaratory Order .......................8

        2.    Delaware's Request for an Extension of Time.............10

        3.    Delaware's Reply to the Petition for Declaratory Order..............11

        4.    Interested Parties' Reply to the Petition
            for Declaratory Order ..................................................13

        5.    The Board's Decision ..................................................14

SUMMARY OF ARGUMENT ..................................................................16

STANDING ..............................................................................................19

ARGUMENT ....................................................................................... 19

I.      STANDARD OF REVIEW ...................................................................... 19

II.     THE ICCTA DOES NOT PREEMPT PUBLIC HEALTH AND
        SAFETY REGULATIONS THAT ARE NARROWLY TAILORED
        TO AVOID UNDULY BURDENING OR INTERFERING WITH
        INTERSTATE RAIL TRANSPORTATION ............................................. 21

        A.   The ICCTA Does Not Preempt States' Traditional Police Powers ....... 22

        B.   States' Exercise of Their Police Powers Are Categorically
             Preempted in Only Two Narrow Circumstances ................................... 23

             1.   States May Not Directly Regulate Aspects of Rail
                  Transportation Related to the Movement of
                  Passengers or Property ................................................................. 24

             2.   States May Not Impose "Preclearance" or "Permitting"
                  Requirements That May Deny the Railroad the Ability to
                  Conduct Operations Authorized by the Board ............................ 28

        C.   State Regulation Is Permissible If It Does Not Unreasonably
             Burden or Interfere With Interstate Rail Transportation ..................... 29

III.    THE BOARD WAS ARBITRARY AND CAPRICIOUS IN
        CONCLUDING THAT SB 135 WAS CATEGORICALLY
        PREEMPTED UNDER THE ICCTA ..................................................... 31

        A.   SB 135 is Narrowly Tailored to Protect Public Health and Safety,
             While Avoiding the Regulation of Rail Transportation ...................... 32

             1.   SB 135 Does Not Regulate Transportation ................................. 32

             2.   Courts Have Refused to Apply a Per Se Rule in Cases
                  Involving Unnecessary Locomotive Idling ................................ 36

        B.   The Board Failed to Draw a "Rational Connection" Between
             SB 135's Narrowly Tailored Limitations on Nocturnal Idling
             and the Statutory Definition of "Transportation" ............................. 38

             1.   The Board Had No Factual Basis to Conclude
                  That SB 135 Regulates Rail Transportation
                  Under the ICCTA ....................................................................... 38

v

2. Contrary to the Board's Assertion, Prior Cases
Do Not Address Narrowly Tailored Public Health
and Safety Laws Such as SB 135 ..................................................40

IV. THE BOARD WAS ARBITRARY AND CAPRICIOUS IN
CONCLUDING THAT SB 135 UNREASONABLY BURDENS
AND INTERFERES WITH RAIL TRANSPORTATION.........................44

A. The Board Lacked Substantial Evidence to Conclude
That SB 135 Unreasonably Burdens and Interferes
With Rail Transportation ....................................................................45

B. Instead of Balancing the Harms, the Board Arbitrarily and
Capriciously Concluded SB 135 Was Preempted as Applied ..............47

1. SB 135 Does Not Impermissibly Vest Discretion in
Local Law Enforcement ...............................................................48

2. The Possibility of a "Patchwork" of Regulations,
Standing Alone, is Insufficient to Preempt State
and Local Law .............................................................................49

CONCLUSION AND RELIEF SOUGHT, AND REQUEST
FOR ORAL ARGUMENT ..................................................................52

CERTIFICATE OF COMPLIANCE......................................................53

CERTIFICATE OF SERVICE .............................................................54

vi

# TABLE OF AUTHORITIES

## CASES

*Adrian & Blissfield R.R. Co. v. Blissfield*,
   550 F.3d 533 (6th Cir. 2008) ...................................................................6, 23, 44

*Ass'n of Am. R.R. v. S. Coast Air Quality Mgmt. Dist.*,
   No. CV 06-01416, 2007 U.S. Dist. LEXIS 65685
   (C.D. Cal. Apr. 30, 2007) ................................................................40, 41, 42, 46

*City of Arlington v. FCC*, 133 S. Ct. 1863 (2013) ...................................................20

*City of Auburn v. United States*, 154 F.3d 1025 (9th Cir. 1998) .............................28

*City of Lincoln v. Surface Transp. Bd.*,
   414 F.3d 858 (8th Cir. 2005) ...........................................................31, 39, 44, 46

* *Del Grosso v. Surface Transp. Bd.*,
   804 F.3d 110 (1st Cir. 2015)................................... 20, 21, 24, 27, 31, 35, 36, 38

* *Del Grosso v. Surface Transp. Bd.*, 811 F.3d 83 (1st Cir. 2016) ..................20, 21

* *Emerson v. Kan. City S. Ry. Co.*, 503 F.3d 1126 (10th Cir. 2007).....25, 28, 34, 38

*Fayus Enters. v. BNSF Ry.*, 602 F.3d 444 (D.C. Cir. 2010)....................................20

*Fla. E. Coast Ry. v. City of W. Palm Beach*,
   266 F.3d 1324 (11th Cir. 2001) ..............................................................5, 23, 24

* *Franks Inv. Co. LLC v. Union Pac. R.R. Co.*,
   593 F.3d 404 (5th Cir. 2010) ....................................... 20, 21, 25, 26, 31, 34, 44

*Friberg v. Kan. City S. Ry.*, 267 F.3d 439 (5th Cir. 2001) .....................................25

*Green Mt. R.R. Corp. v. Vermont*,
   404 F.3d 638 (2nd Cir. 2005) ...........................................................22, 28, 29, 50

*Guckenberg v. Wisc. Cent. Ltd.*,
   178 F. Supp. 2d 954 (E. D. Wis. 2001) ..................................................30, 31, 37

* Authorities upon which we chiefly rely are marked with asterisks.

*In re Universal Serv. Fund Tel. Billing Practice Litig.*,
   619 F.3d 1188 (10th Cir. 2010) .........................................................................20

\* *Island Park, LLC v. CSX Transp.*,
   559 F.3d 96 (2nd Cir. 2009) ......................................... 16, 24, 26, 30, 31, 35, 34

*Montalvo v. Spirit Airlines*, 508 F.3d 464 (9th Cir. 2007).......................................25

*Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150 (4th Cir. 2010).................24

\* *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*,
   500 F.3d 238 (3rd Cir. 2007) .................... 5, 6, 21, 22, 23, 29, 30, 33, 34, 47, 48

*Riffin v. Surface Transp. Bd.*, 592 F.3d 195 (D.C. Cir. 2010) ....................17, 19, 29

*Seminole Tribe of Fla. v. Stranburg*, 799 F.3d 1324 (11th Cir. 2015) ...................20

*Smith v. CSX Transp., Inc.*, No. 14 C 5704,
   2015 U.S. Dist. LEXIS 8931, (N.D. Ill. 2015) .......................................30, 31, 36

*Soo Line R.R. Co. v. City of Minneapolis*,
   38 F. Supp. 2d 1096 (D. Minn. 1998).................................................................28

*Steel Inst. of N.Y. v. City of New York*, 716 F.3d 31 (2nd Cir. 2013) .....................20

*Tex. Cent. Bus. Lines Corp. v. City of Midlothian*,
   669 F.3d 525 (5th Cir. 2012) ...............................................................31, 37, 41

*Tubbs v. Surface Transp. Bd.*, 812 F.3d 1141(8th Cir. 2015)..................................44

*Wyeth v. Levine*, 555 U.S. 555 (2009) ..............................................................19, 20

## ADMINISTRATIVE DECISIONS

*Cities of Auburn and Kent, Wa.*, 2 S.T.B. 330,
STB Finance Docket No. 33200 (Service Date July 2, 1997)..................................44

*CSX Transp.*, STB Finance Docket No. 34662
   (Service Date May 3, 2005)..................................................................................26

*Twp. of Woodbridge*, STB Finance Docket No. 42053
   (Service Date Dec. 1, 2000)..................................................................................46

*U.S. EPA*, STB Finance Docket No. 35803
  (Service Date Dec. 30, 2014)............................................................42, 43, 50, 51

*Union Pac. R.R. Co.*, STB Finance Docket No. 35504
  (Service Date Apr. 25, 2013) .........................................................................31

## FEDERAL STATUTES

5 U.S.C. § 554(e) ....................................................................................2, 20

28 U.S.C. § 2321 ............................................................................................2

28 U.S.C. § 2343 ............................................................................................2

28 U.S.C. § 2344 ............................................................................................2

49 U.S.C. § 10102(9) ...........................................................................5, 25, 27

49 U.S.C. § 10501(b) ......................................................................1, 2, 5, 19, 22, 24

## STATE STATUTES AND REGULATIONS

Del. Code Ann. Tit. 21, § 8501............................................................................1, 2

Del. Code Ann. Tit. 21, § 8502...................................................................1, 2, 7, 32

Del. Code Ann. Tit. 21, § 8503.........................................................1, 2, 7, 8, 32, 39, 46

Del. Code Ann. Tit. 21, § 8504...............................................................1, 2, 8, 49

Del. Code Ann. Tit. 21, § 8505...............................................................1, 2, 8, 48

## OTHER AUTHORITIES

Am. Heritage Dictionary (2d ed. 1982) ............................................................32

Michael G. Smith et al., *Vibrations from Freight Trains Fragments
Sleep: A Polysomnographic Study*, 6 Sci. Rep. 24717 (2016) ................................7

Mahnaz Saremi et al., *Effects of Nocturnal Railway Noise on Sleep Fragmentation in Young and Middle-Aged Subjects as a Function of Type of Train and Sound Level*, 70 Int'l J. of Psychophysiology 184 (2008) ...................................................................................................7

Patricia Tassi et al., *Long Term Exposure to Nocturnal Railway Noise Produces Chronic Signs of Cognitive Deficits and Diurnal Sleepiness*, 33 J. of Envtl Psychol. 45 (2013)..............................................................7

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| AAR | The Association of American Railroads |
| APA | Administrative Procedure Act, 5 U.S.C. § 702 *et seq.* |
| Board | Surface Transportation Board |
| Delaware | State of Delaware |
| CSXT | CSX Transportation, Inc. |
| ICC | Interstate Commerce Commission |
| ICCTA | Interstate Commerce Commission Termination Act |
| NSR | Norfolk Southern Railroad Co. |
| Railroads | Collectively, the Association of American Railroads, Norfolk Southern Railroad Co., and CSX Transportation, Inc. |
| SB 135 | Delaware Senate Bill 135, Del. Code Ann. tit. 21, § 8501–8505 |
| SIP | State Implementation Plan |
| STB | Surface Transportation Board |

CASE NO. 16-1121

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————————————————

STATE OF DELAWARE,
Petitioner,

v.

SURFACE TRANSPORTATION BOARD and the
UNITED STATES OF AMERICA,
Respondent.

———————————————————————————

## BRIEF OF PETITIONER STATE OF DELAWARE

———————————————————————————

Review of STB Order; Petition of Norfolk Southern Railway Company,
STB Finance Docket No. 35949 (Service Date Feb. 22, 2016)

———————————————————————————

## JURISDICTIONAL STATEMENT

### A.    The Board's Jurisdiction

On August 4, 2015, Norfolk Southern Railway Company ("NSR") filed a

petition for declaratory order with the Surface Transportation Board ("Board" or

"STB"), requesting that it find Delaware Senate Bill 135 ("SB 135"), Del. Code

Ann. tit. 21, §§ 8501–8505 (Addendum of Statutes and Regulation ("Addendum")

4–6), preempted by the ICC Termination Act of 1995 ("ICCTA"), 49 U.S.C.

§ 10501(b) (Addendum 3).  The Board had jurisdiction to issue a declaratory order so as to terminate a controversy or remove uncertainty.  5 U.S.C. § 554(e).

### B.    This Court's Jurisdiction

On February 22, 2016, the Board served its decision in *Petition of Norfolk Southern Railway Company*, STB Finance Docket No. 35949 (Service Date Feb. 22, 2016) ("Board Decision") (Joint Appendix ("J.A.") 86–91), finding that SB 135 was preempted by 49 U.S.C. § 10501(b) (Addendum 3).  The State of Delaware ("Delaware") timely filed its Petition for Review on April 19, 2016. This Court has jurisdiction to review the Board's declaratory order pursuant to 28 U.S.C. §§ 2321, 2343, 2344.

### STATEMENT OF ISSUES

Was the Board's Order finding SB 135, codified at Del. Code Ann. tit. 21, § 8501–8505 (Addendum 4–6), preempted by 49 U.S.C. § 10501(b) (Addendum 3) arbitrary and capricious, unsupported by substantial evidence, and not in accordance with law where:

1.     SB 135 is narrowly-tailored to prohibit only locomotive idling that (a) is not essential to the provision of transportation by a rail carrier and (b) occurs very near residential neighborhoods and at night, degrading the quality of life, property, and environment of citizens of Delaware; and

2.      There was no evidence before the Board that SB 135 would unreasonably burden or interfere with rail transportation?

## STATEMENT OF THE CASE

This case arises from the Board's declaratory order finding SB 135 preempted under the ICCTA.  The State of Delaware enacted SB 135 to protect people in their homes from the deleterious health effects of being regularly exposed to noise and vibrations from idling diesel locomotives when they are trying to sleep.  Mindful that the states' traditional police powers do not extend so far as to permit the imposition of an unreasonable burden on rail transportation, Delaware narrowly tailored SB 135 to restrict only idling at night that is not necessary, *i.e.*, not related to the movement of passengers or property by rail, in order to protect the quality of life of its affected citizens.

Before SB 135 had even been enacted, much less enforced, NSR commenced the proceeding below, asking the Board to invalidate SB 135 on the basis that it was facially preempted by the ICCTA.  The Board granted NSR's petition, finding that SB 135 was "categorically preempted," even if it would have no effect whatsoever on NSR's operation, because it "has the effect of directly managing and governing the operation of locomotives . . . ."  Board Decision at 4 (J.A. 89).  The Board further held that SB 135 would be preempted "as-applied"

3

because even its minimal imposition might, in the aggregate, unreasonably burden interstate transportation. *Id.* at 5 (J.A. 90).

The Board's decision violates the APA and must be vacated and remanded for three reasons:

1. The ICCTA does not preclude a state from exercising its traditional police powers to protect its citizens in their homes from harm through means that do not unreasonably burden interstate transportation;

2. The Board's finding that the ICCTA categorically preempts SB 135, merely because it concerns the operation of a locomotive, is plainly inconsistent with established law.  States may adopt minimally burdensome limitations even on instrumentalities of rail transportation, so long as they do not seek to directly manage or govern aspects of rail transportation related to the movement of passengers or property; and

3. The Board had no evidence whatsoever in the record upon which to conclude that the limitations imposed by SB 135 would necessarily constitute an unreasonable burden.

## STATEMENT OF THE FACTS AND REGULATORY FRAMEWORK

### A.    Statutory Framework and Federal Preemption

Pursuant to the ICCTA, the Board has jurisdiction over–

> (1) transportation by rail carriers, and the remedies provided [by the ICCTA] with respect to rates,

4

classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State . . . .

49 U.S.C. § 10501(b) (Addendum 3).  The Board's jurisdiction over such matters is exclusive, and the ICCTA expressly preempts "remedies [provided under federal or state law] with respect to regulation of rail transportation."  *Id.*  In this context, the term "transportation" is defined to include "a locomotive . . . or equipment of any kind related to the movement of passengers or property, or both, by rail . . . and services related to that movement."    49 U.S.C. § 10102(9) (Addendum 3).

Courts and the Board have interpreted the phrase "regulation of transportation" to expressly "preempt[] all 'state laws that may reasonably be said to have the effect of managing or governing rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation.'"  *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 252 (3rd Cir. 2007) (quoting *Fla. E. Coast Ry. v. City of W. Palm Beach*, 266 F.3d 1324, 1331 (11th Cir. 2001)); *accord* Board Decision at 3 (J.A. 88).  The Board refers to this form of preemption as "categorical preemption."  Board Decision at 3 (J.A. 88).  Courts and the Board have found two general categories of state

5

regulation categorically preempted under this standard: (1) those that seek to directly regulate aspects of rail transportation related to the movement of passengers and property; and (2) those which impose "permitting" or "preclearance" requirements that may be used to deny the railroad the ability to conduct its operations. *See Adrian & Blissfield R.R. Co. v. Blissfield*, 550 F.3d 533, 540 (6th Cir. 2008) (citing *CSX Transp., Inc.*, STB Finance Docket No. 34662, *slip op.* at 3 (Service Date May 3, 2005)).

However, where state or local law does not seek to manage or govern rail transportation, the ICCTA "does not 'usurp the right of state and local entities to impose appropriate public health and safety regulation on interstate railroads,' so long as those regulations do not interfere with or unreasonably burden railroading." *N.Y. Susquehanna*, 500 F.3d at 252 (internal quotations omitted) (quoting *King Cnty, Wa.*, 1 S.T.B. 731, 735 (Service Date Sept. 25, 1996)).  The Board generally refers to the preemption of state regulation that unreasonably burdens rail transportation as "as-applied" preemption.  Board Decision at 4 (J.A. 89).

**B.    Delaware Senate Bill 135**

After years of fielding complaints from concerned constituents and unsuccessful attempts at brokering a voluntary compromise with NSR to reduce the serious, harmful impacts[1] of locomotive idling on residences near NSR track,

---

[1] Regular nocturnal exposure to noise and vibrations from idling (cont'd)

6

Senator David B. McBride introduced SB 135 in the Delaware General Assembly. SB 135 requires only that "[n]o person may permit the *non-essential* idling[2] of a locomotive under its control or on its property between 8 p.m. and 7 a.m." Del. Code Ann. tit. 21, § 8503(a) (Addendum 5) (emphasis added). Because the law is intended only to protect citizens of Delaware within their homes, it does not apply within properties zoned for industrial use (*i.e.*, a railroad's storage and maintenance yards, or its customers' transloading facilities). *See* Del. Code Ann. tit. 21 § 8503(c) (Addendum 5). And, in recognition of the railroads' legitimate operating needs, SB 135 exempts a wide swath of circumstances from its reach; specifically, any which results from:

> (1)    Traffic conditions;
>
> (2)    The direction of a law enforcement officer;
>
> (3)    The operation of defrosting, heating, or cooling equipment to ensure the health or safety of the driver or passenger;

---

locomotives has been linked to significantly deleterious health effects, ranging from diminished daytime attentional capacity to increased risk for diabetes and certain cancers. *See*, *e.g.*, Michael G. Smith et al., *Vibrations from Freight Trains Fragments Sleep: A Polysomnographic Study*, 6 Sci. Rep. 24717 (2016), available at http://www.nature.com/articles/srep24717; Patricia Tassi et al., *Long Term Exposure to Nocturnal Railway Noise Produces Chronic Signs of Cognitive Deficits and Diurnal Sleepiness*, 33 J. of Envtl Psychol. 45 (2013); Mahnaz Saremi et al., *Effects of Nocturnal Railway Noise on Sleep Fragmentation in Young and Middle-Aged Subjects as a Function of Type of Train and Sound Level*, 70 Int'l J. of Psychophysiology 184 (2008).

[2] Idling is defined by SB 135 as "the operation of the locomotive while it is stationary." Del. Code Ann. tit. 21, § 8502(1) (Addendum 4).

> (4)     The operation of the primary propulsion engine for essential work-related mechanical or electrical operations other than propulsion; [or]
>
> (5)     Required maintenance, servicing, repairing, diagnostics, or inspections.

Del. Code Ann. tit. 21, § 8503(b) (Addendum 5). State or local law enforcement officers encountering a violation of SB 135 may only issue a civil fine,[3] which is judicially reviewable in the Delaware Superior Court. Del. Code Ann. tit. 21, §§ 8504–8505 (Addendum 5–6). SB 135 does not impose any sort of permitting requirement on a railroad, and contains no mechanism through which Delaware or its agent may prohibit a railroad's operation, even if the railroad is habitually non-compliant.

SB 135 was passed by the Delaware Senate on June 18, 2015, by the Delaware House of Representatives on June 30, 2015, and signed into law by Governor Jack Markell on August 14, 2015.

## C.     The STB Proceeding

### 1. The NSR Petition for Declaratory Order

On August 4, 2015, shortly before SB 135 was signed into law, NSR filed a petition with the Board seeking a declaratory order that SB 135 was preempted by the ICCTA. NSR argued that SB 135 was categorically preempted, because it

---

[3] SB 135 establishes a fine between $5,000 and $10,000 for the initial offense, and between $10,000 and $20,000 for each offense thereafter. Del. Code Ann. tit. 21, § 8505

"specifically *prohibits* railroads from idling locomotives at certain times and in certain locations." NSR's Pet. for Expedited Declaratory Order ("NSR Petition"), STB Finance Docket No. 35949, at 7 (Filed Aug. 4, 2015) (J.A. 9) (emphasis in original). NSR claimed that such a "prohibition" was akin to the type of "preclearance" or "permitting" requirements that the Board has traditionally found to be preempted, asserting SB 135's restrictions "are absolute, prohibiting a railroad from operating its locomotives except under conditions dictated by the state." *Id.*

NSR also argued that SB 135 was preempted because it "interfere[s] with rail transportation." *Id.* at 9 (J.A. 11). NSR argued generally that "the practice of idling locomotives goes to the very core of rail transportation, [that] there are various operational reasons underlying [NSR's] decision to idle locomotives," and offered three specific examples:

> [NSR] idles locomotives that are parked with attached train cars in order to maintain the air line throughout the train, which is necessary for the braking system to function properly. If the air line is not maintained for 4 hours, a complete air test, which can be a time-consuming and complex process, is required by law. As another example, [NSR] often idles locomotives due to unforeseen circumstances, such as train crew shortages or scarce rail capacity. Under these circumstances, fully shutting down and restarting the train would consume significant time, only adding to network congestion and delays. And as a third example, Norfolk Southern idles locomotives when the temperature drops below, or is projected to drop below, 35 degrees Fahrenheit, in order

9

> to prevent damage to the train from the automatic
> dumping or freezing of the locomotive cooling system.

*Id.* at 2–3, 9 (J.A. 4–5, 11).  The NSR petition did not assert, however, that any of the above activities were likely to be considered "non-essential" idling and therefore prohibited under SB 135.  The petition also made no attempt to describe the extent to which SB 135's allegedly interferes with rail transportation, nor did it attempt to balance such interference against the severity of the public harm that SB 135 is intended to mitigate.

### 2.  Delaware's Request for an Extension of Time

Delaware initially responded with a request for an extension of time to file its reply to NSR's petition, noting that "most of the reasons for which [NSR] suggest[ed] that it idles trains seem to fall within the exceptions specifically provided in the Statute."  Delaware's Mot. to Extend Time for Reply ("Motion to Extend"), STB Finance Docket No. 35949, at 2–3 (Filed Aug. 20, 2015) (J.A. 34–35).  Accordingly, Delaware requested additional time to investigate and potentially take discovery on SB 135's likely effect on NSR's operations.  *Id.*  The Board approved Delaware's request for an extension without comment. Board Order, STB Finance Docket No. 35949 (Service Date Aug. 24, 2015) (J.A. 39).  Two days later, NSR filed a response to Delaware's request for an extension of

time.  NSR consented to the Delaware's request for an extension of time,[4] but preemptively opposed any discovery, arguing that "[a]s [SB 135] is categorically preempted on its face, the impact of the statute on [NSR's] operations is totally irrelevant."  NSR's Resp. to Mot. to Extend Time for Reply ("NSR Response"), STB Finance Docket No. 35949, at 3–4 (Filed Aug. 26, 2015) (J.A. 46–47).

Following this effective abandonment of NSR's "as-applied" challenge to SB 135, NSR made no further attempt to quantify the extent of SB 135's alleged impact on rail transportation, nor in any way address the public harm SB 135 is intended to mitigate.  No discovery was conducted nor sought by Delaware.

### 3.  Delaware's Reply to the Petition for Declaratory Order

Delaware filed its reply to NSR's petition on October 23, 2015.  While acknowledging the ICCTA's broad preemptive effect, Delaware argued that the ICCTA does not preempt states' traditional police powers where the law "is narrowly tailored to provide protection to residents in a manner that does not interfere with the valid pursuit of rail operations, does not unreasonably restrict the railroad from conducting those operations, and does not unreasonably burden interstate commerce."  Reply of the State of Delaware ("Delaware Reply"), STB Finance Docket No. 35949, at 3 (Filed Oct. 23, 2015) (J.A. 59).

---

[4] Counsel for Delaware conferred with NSR at the time of the request, and agreed not to enforce SB 135 until the Board had rendered a final decision.  To date, Delaware has not sought to enforce SB 135.

First, Delaware explained that SB 135 was not categorically preempted under either of the general categories of state and local actions typically found to conflict with the ICCTA because SB 135 "does not manage or govern rail transportation" and because it "carefully and specifically avoid[s] regulating idling" essential to railroad operations. *Id.* at 4–5 (J.A. 60–61). Indeed, by exempting idling that is the result of a wide range of circumstances, Delaware showed SB 135 was "precisely aimed at activities that are not necessary to the railroad's operations." *Id.* at 5 (J.A. 61). Delaware also demonstrated that SB 135 could not be construed as a type of "preclearance" or "permitting" requirement that would subject a railroad to a pre-approval process in order to conduct activities authorized by the Board. Specifically, Delaware explained that "SB 135 confers no discretion on State officials to prevent any operations or movement of trains and does not seek to prohibit, limit or regulate railroad operations or to permit the exercise of discretion by a state or local official before the fact." *Id.* at 6 (J.A. 62). To the contrary, the "criteria set forth in SB 135 are objective," and "if a railroad is approached by a law enforcement officer, the railroad can readily demonstrate whether it meets the statutory standards." *Id.* at 7 (J.A. 63).

Second, Delaware urged the Board to find that even if SB 135 could be understood to have some impact on rail transportation, that impact fell well short of an unreasonable burden, and that SB 135 was therefore not preempted "as

12

applied." *Id.* at 2 (J.A. 59). Delaware emphasized that "SB 135 was enacted for a narrowly-defined purpose to reduce harms to people in their homes, [and] not to broadly regulate [NSR's] operations." *Id.* at 5 (J.A. 61). Accordingly, Delaware explained that SB 135 only applies between 8 p.m. and 7 a.m., "when peace and quiet are essential conditions for residential areas," and does not apply within the boundaries of property zoned for industrial use. *Id.* at 7 (J.A. 63). Because SB 135 "is framed with reference to the impact the rail operations have on the surrounding residents, not the operations themselves," and "narrowly-tailored to address the health, safety, and welfare of the citizens of Delaware," SB 135 is not preempted. *Id.* at 8 (J.A. 64).

### 4. Interested Parties' Reply to the Petition for Declaratory Order

The Association of American Railroads (AAR) and CSX Transportation, Inc. (CSXT) (with NSR, the "Railroads") each filed a reply in support of NSR's petition. AAR claimed that "the Board need not assess the impact of [SB 135] on rail operations[,] [because] [t]he statute at issue here would directly regulate rail operations and is therefore categorically preempted." Reply of the Association of American Railroads ("AAR Reply"), STB Finance Docket No. 35949, at 4 (Filed Oct. 23, 2015) (J.A. 81). CSXT similarly asserted that SB 135 "would . . . significantly burden operations in Delaware," and asked the Board to "to go further and ensure that railroads retain their statutory right to be free of

conflicting state regulation so as to enhance the safety and efficiency of railroad operations." Reply of CSX Transportation, Inc. ("CSX Reply"), STB Finance Docket No. 35949, at 3 (Filed Oct. 23, 2015) (J.A. 51) (footnote omitted). Neither AAR nor CSXT made any attempt to describe how SB 135 would impact on rail transportation, provide an example of necessary idling for which SB 135 would impose a fine, or so much as acknowledge the serious public health consequences associated with unnecessary nighttime idling.

### 5. The Board's Decision

By order served February 25, 2016, the Board held that SB 135 was categorically preempted because it "has the effect of directly managing and governing the operation of locomotives that are essential parts of rail transportation," citing as examples only the three proffered by NSR in its initial pleading. Board Decision at 4 (J.A. 89) (citing NSR Petition, Ex. A (J.A. 20–24)). The Board rejected Delaware's argument that it had narrowly tailored SB 135 so as not to interfere with essential railroad activities, stating–

> Delaware has purported to determine for the railroad which rail operations are essential and which are not. In particular, an instance of idling that the state deems 'non-essential' may in fact be important from an operational standpoint. By substituting its judgment for that of the railroads, the state is directly managing rail operations for NSR and other railroads.

*Id.* (citing *U.S. EPA*, STB Finance Docket No. 35803, *slip op.* at 9 (Service Date Dec. 30, 2014)).   The Board held that even if "rules targeting unnecessary idling . . . address activity that 'has no transportation purpose' . . . [they] conflict[] with the Board's exclusive jurisdiction over rail operations and [are] categorically preempted by § 10501(b) [(Addendum 3)]."  *Id.* at 5 (J.A. 90) (quoting *U.S. EPA*, *slip op.* at 9).

The Board went on to hold that SB 135 would be "preempted on an 'as applied' basis," even if not categorically preempted, because the law "has the effect of unreasonably burdening and interfering with rail transportation."  *Id.*  The Board gave only two reasons for this conclusion.  First, the Board found that SB 135 "leaves it to the discretion of local police officers to determine whether an idling locomotive is in violation of the law."  *Id.*  "Allowing local officials to make such judgments on operational necessity," the Board reasoned, "is necessarily burdensome on railroads and unreasonably interferes with the daily management and operational decisions made by railroads."  *Id.* (citing NSR Petition, Ex. A (J.A. 20–24)).  Second, the Board stated that "[i]ndividual state or local laws, such as SB 135, that regulate locomotive operations would interfere with a railroad's ability to uniformly operate its rail lines, thus contravening Congress's purpose in enacting § 10501(b) [(Addendum 3)]."  *Id.*  The Board did not cite any evidence – because the Railroads presented no evidence – as to whether SB 135 would

15

*actually* burden rail operations or what the operational significance of those burdens would be.  Necessarily, the Board also failed to balance any such burden against Delaware's concern for the public health and welfare of its citizens.

## SUMMARY OF ARGUMENT

SB 135 was enacted to protect people in their homes from the harmful effects of idling diesel locomotives when they are trying to sleep.  It is narrowly tailored to apply only to unnecessary idling during nighttime hours in residential areas.

The Board's sweeping conclusion that the ICCTA categorically preempts SB 135 was wrong on the law, and is not entitled to deference by this Court. While the scope of preemption under the ICCTA is broad, it "does not categorically sweep up all state regulation that touches upon railroads" and does not displace states' ability to act under their traditional police powers to protect its citizens from harm.  *See Island Park, LLC v. CSX Transp.*, 559 F.3d 96, 104 (2nd Cir. 2009).  Rather, states may impose limitations on railroad-related activities in order to protect the public from harm, so long as they do not unreasonably burden rail transportation.

In only two narrow circumstances have courts and the Board found state regulation related to rail transportation to be unreasonable *per se*: (1) where states directly manage or govern aspects of rail transportation related to the movement of

16

passengers or property; or (2) where, through the imposition of "permitting" or "preclearance" requirements, states seek to control whether rail transportation may occur at all. However, courts have steadfastly rejected the categorical preemption of public health and safety regulation that would not interfere with the movement of passengers or property. State and local regulation that is not categorically preempted is preempted only when it unreasonably burdens rail transportation, a necessarily fact-intensive inquiry.

The Board erred in finding SB 135 categorically preempted. On its face, SB 135 does not seek to directly manage or govern any aspect of rail transportation essential to the movement of passengers or property, nor does it impose a "permitting" or "preclearance" requirement. Instead, SB 135 is directed only at unnecessary idling at night, in residential areas. Rather than "draw a rational connection" between the conduct actually limited by SB 135 and the statutory definition of "rail transportation," the Board deferred entirely to NSR's unproven assertion that the non-essential, nighttime idling in residential areas limited by SB 135 "*may* in fact be important from an operational standpoint." *See* Board Decision at 4 (J.A. 89) (emphasis added). This falls short of the Board's responsibility under the APA, as well as the standard for preemption under the ICCTA.

The Board also erred in finding that SB 135 was preempted as-applied. The Board held that that SB 135 had "the effect of unreasonably burdening and interfering with rail transportation," but made no findings of fact to support its conclusion. *See* Board Decision at 5 (J.A. 90). Indeed, NSR's entire argument before the Board was that it need *not* demonstrate any interference with rail transportation, and NSR made no effort to do so, much less attempt to establish that the interference was unreasonable in light of Delaware's interest in protecting its citizens. NSR failed to meet its burden with respect to this key issue, and the Board lacked *any* evidence upon which to base its conclusion. Moreover, the Board erred in finding that SB 135 imposed an unreasonable burden because SB 135 was enforced by police officers and because other states may impose a similar requirement. Courts have expressly recognized that local law enforcement officers may exercise limited discretion in enforcing state and local regulations against a railroad, and the ICCTA was not intended to insulate the railroads from a "patchwork" of minimally burdensome public health and safety regulations that do not unreasonably interfere with rail transportation.

Because the Board failed to draw a "rational connection" between the activity actually limited by SB 135 and "rail transportation" under the ICCTA, and had no evidence upon which to conclude that SB 135 unduly burdened rail transportation, this Court must vacate the Board's order and remand.

## STANDING

The Board's decision held that SB 135 was preempted by 49 U.S.C. § 10501(b) (Addendum 3). The State of Delaware has standing to challenge the Board's invalidation of its laws before this Court.

## ARGUMENT

## I.     STANDARD OF REVIEW

This Court reviews an order of the Board under the Administrative Procedure Act ("APA"), and must set aside a decision that is unsupported by substantial evidence, or that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See Riffin v. Surface Transp. Bd.*, 592 F.3d 195, 197 (D.C. Cir. 2010) (quoting 5 U.S.C. § 706(2)(A) (Addendum 2)). The APA requires the Board to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* at 198 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983)).

The weight accorded the Board's decision "depends on its thoroughness, consistency, and persuasiveness." *Wyeth v. Levine*, 555 U.S. 555, 577 (2009) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). In *Wyeth*, the Supreme Court held that "agencies have no special authority to pronounce on preemption absent delegation by Congress . . . ." and declined to apply *Chevron* deference to

19

an agency's preemption decision.  *Id.* at 576–77.  As the Court subsequently explained, an "agency must have received congressional authority to determine the particular matter at issue in the particular manner adopted" in order for *Chevron* deference to apply.  *City of Arlington v. FCC*, 133 S. Ct. 1863, 1874 (2013).  Thus, when an agency "takes regulatory action under an authorizing statute and preemption is a collateral consequence of that action," *Chevron* deference is appropriate.  *Del Grosso v. Surface Transp. Bd.*, 811 F.3d 83, 85 (1st Cir. 2016) (Order on Pet. for Panel Reh'g).  But where Congress has not expressly authorized an agency to preempt state law, "the courts of appeals have been unanimous in concluding that *Chevron* deference does not apply to preemption decisions by federal agencies." *Del Grosso v. Surface Transp. Bd.*, 804 F.3d 110, 116–17 (1st Cir. 2015), *reh'g denied*, 811 F.3d 83 (2016); *see also Seminole Tribe of Fla. v. Stranburg*, 799 F.3d 1324, 1338 (11th Cir. 2015); *Steel Inst. of N.Y. v. City of New York*, 716 F.3d 31, 39–40 (2nd Cir. 2013); *In re Universal Serv. Fund Tel. Billing Practice Litig.*, 619 F.3d 1188, 1200 (10th Cir. 2010); *Franks Inv. Co. LLC v. Union Pac. R.R. Co.*, 593 F.3d 404, 413–14 (5th Cir. 2010) (en banc).[5]

In this case, the Board issued a declaratory order pursuant to its general powers under the APA.  *See* 5 U.S.C. § 554(e); Board Decision at 2 (J.A. 87).  As

---

[5] This Court has not expressed a contrary view, but has noted that the deference due to an agency's decision *against* preemption remains an "open question."  *See Fayus Enters. v. BNSF Ry.*, 602 F.3d 444, 446–47 (D.C. Cir. 2010).

the First Circuit has found, "this is not a situation where Congress has directly authorized the Board to preempt state law." *Del Grosso*, 811 F.3d at 85 (where the Board interpreted the statutory term "transportation" to find state law preempted); *see also Franks*, 593 F.3d at 414 (holding that "[t]he STB's decision regarding the preemptive effect of the ICCTA and the test it uses to determine preemption are not binding"). Accordingly, the Board's legal determination as to the scope of preemption under the ICCTA and its application to SB 135 is entitled only to *Skidmore* deference.

Deference is owed to the Board's *factual* determinations only where they are "supported by substantial evidence and a rational basis in the facts on the record." *Del Grosso*, 804 F.3d at 117 (internal quotations omitted) (emphasis added).

## II.  THE ICCTA DOES NOT PREEMPT PUBLIC HEALTH AND SAFETY REGULATIONS THAT ARE NARROWLY TAILORED TO AVOID UNDULY BURDENING OR INTERFERING WITH INTERSTATE RAIL TRANSPORTATION

While the ICCTA preempts state and local law that has "the effect of managing or governing rail transportation," its reach is not so extensive as to "usurp the right of state and local entities to impose appropriate public health and safety regulation" to protect people in their homes from serious physiological harm. *See N.Y. Susquehanna*, 500 F.3d at 252 (internal quotations omitted).

## A.     The ICCTA Does Not Preempt States' Traditional Police Powers

Courts and the Board have repeatedly recognized that the ICCTA did not intend to displace states' traditional police powers. *Green Mt. R.R. Corp. v. Vermont*, 404 F.3d 638, 643 (2nd Cir. 2005) (citing H.R. Rep. No. 104-311, at 96 (1995), reprinted in 1995 U.S.C.C.A.N. 793, 808)). Indeed, shortly after the ICCTA's passage, the Board recognized numerous instances where the ICCTA would not preempt public health and safety regulation, even where it would overlap with matters within the Board's exclusive jurisdiction:

> For example, even in cases where we approve a construction or abandonment project,[6] a local law prohibiting the railroad from dumping excavated earth into local waterways would appear to be a reasonable exercise of local police power. Similarly, as noted by the Secretary [of Transportation], a state or local government could issue citations or seek damages if harmful substances were discharged during a railroad construction or upgrading project. A railroad that violated a local ordinance involving the dumping of waste could be fined or penalized for dumping by the state or local entity. The railroad also could be required to bear the cost of disposing of the waste from the construction in a way that did not harm the health or wellbeing of the local community.

*N.Y. Susquehanna*, 500 F.3d at 252–53 (quoting *Cities of Auburn & Kent, Wa.*, STB Finance Docket No. 33200, *slip op.* at 6 (Service Date July 2, 1997), *aff'd sub*

---

[6] The Board has exclusive jurisdiction over the construction, acquisition, operation, abandonment, or discontinuance of rail line. *See* 49 U.S.C. § 10501(b) (Addendum 3).

*nom. City of Auburn v. United States*, 154 F.3d 1025 (9th Cir. 1998)) (alterations in original); *see also Fla. E. Coast Ry.*, 266 F.3d at 1338–39 (11th Cir. 2001) ("[C]riminal statutes governing antitrust matters not pre-empted by [the ICCTA], and laws defining such criminal offenses as bribery and extortion, remain fully applicable unless specifically displaced, because they do not generally collide with the scheme of economic regulation (and deregulation) of rail transportation.") (quoting H.R. Conf. Rep. 104-422 at 167 (1995)).  Rather, it is well settled that states may "'impose appropriate public health and safety regulation on interstate railroads,' so long as those regulations do not interfere with or unreasonably burden railroading."  *N.Y. Susquehanna*, 500 F.3d at 252 (quoting *King Cnty.*, 1 S.T.B. at 735)).

### B.     States' Exercise of Their Police Powers Are Categorically Preempted in Only Two Narrow Circumstances

While ordinarily a "fact-intensive" inquiry, courts and the Board have found two narrow categories of public health and safety regulation constitute "*per se* unreasonable interference" with rail transportation: (1) those that seek to directly regulate aspects of rail transportation related to the movement of passengers and property; and (2) those which impose "permitting" or "preclearance" requirements that may be used to deny the railroad the ability to conduct its operations.  *See Blissfield*, 550 F.3d at 540 (citing *CSX Transp.*, *slip op.* at 3).

23

1.  States May Not Directly Regulate Aspects of Rail Transportation Related to the Movement of Passengers or Property

Categorical preemption of the first sort flows from the ICCTA's express preemption of state laws "with respect to the regulation of rail transportation." *See* 49 U.S.C. § 10501(b) (Addendum 3).  But, while broad, the ICCTA "does not categorically sweep up *all* state regulation that touches upon railroads . . . ." *Island Park*, 559 F.3d at 104 (emphasis added).  Rather, as the Eleventh Circuit explained–

> [E]xpress pre-emption applies only to state laws "with respect to *regulation* of rail transportation." 49 U.S.C. § 10501(b) (emphasis added). This necessarily means something qualitatively different from laws "with respect to rail transportation." *See Bennett v. Spear*, 520 U.S. 154, 173 (1997) (relying on "'cardinal principle of statutory construction' [that courts must] 'give effect, if possible, to every clause and word of a statute.'") (citations omitted). In this manner, Congress narrowly tailored the ICCTA pre-emption provision to displace only "regulation," i.e., those state laws that may reasonably be said to have the effect of "managing" or "governing" rail transportation, Black's Law Dictionary 1286 (6th ed. 1990), while permitting the continued application of laws having a more remote or incidental *effect* on rail transportation.

*Fla. E. Coast Ry.*, 266 F.3d at 1331 (second emphasis added); *accord Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 157 (4th Cir. 2010).  In the same vein, "not all activities connected with rail transportation are considered 'transportation' under the statute."  *Del Grosso*, 804 F.3d at 118; *see also Emerson v. Kan. City S.*

24

*Ry. Co.*, 503 F.3d 1126, 1129 (10th Cir. 2007) ("While certainly expansive, [the] definition of 'transportation' does not encompass everything touching on railroads."). Instead, "transportation" is limited to a "locomotive . . . or equipment of any kind *related to the movement of passengers or property*, or both, by rail . . . ." 49 U.S.C. § 10102(9) (Addendum 3) (emphasis added). Because this definition marks the boundaries of the ICCTA's express preemption of state and local law, it must be "narrowly and strictly construed." *Montalvo v. Spirit Airlines*, 508 F.3d 464, 474 (9th Cir. 2007) (citing *Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1265 (9th Cir. 1998)); *see also Franks Inv. Co.*, 593 F.3d at 407 ("[W]hen the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption.") (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008)).

Only state and local laws which directly and indiscriminately target aspects of rail transportation related to the movement of passengers or property are preempted under this standard. For example, in *Friberg v. Kan. City S. Ry.*, 267 F.3d 439, 441 (5th Cir. 2001) a Texas statute prohibiting a train from blocking any street, highway or railroad crossing for more than ten minutes – no matter the reason – was held preempted under the ICCTA. This restriction was found to necessarily impact "such areas as train speed, length and scheduling, [and] the way a railroad operates its trains, with concomitant economic ramifications . . . ." *Id.* at

443.  Similarly, in *CSX Transp.*, *slip op.* at 3–4, the Board found that a law enacted by the District of Columbia banning the transportation of certain hazardous commodities within a 2.2-mile radius of the United States Capitol Building was categorically preempted, because it sought to regulate the routing of rail traffic.

Courts have steadfastly rejected the categorical preemption of public health and safety regulation that is *not* related to the movement of passengers or property. In *Island Park*, the Second Circuit considered whether New York's comprehensive regulation of railroad crossings constituted the regulation of "rail transportation." The court found that railroad crossings did appear to fall within the statutory definition of transportation as "property . . . related to the related to the movement of passengers or property . . . by rail," but did not conclude "that *all* state action related to a railroad crossing is pre-empted."  *Island Park*, 559 F.3d at 104 (emphasis in original).  Instead, the court reasoned that "[t]he appropriate questions are: what does the state seek to regulate and does the proposed regulation burden rail transportation?"  *Id.*  Finding that the closure of a railroad crossing would not materially impact the movement of passengers or property and was not intended to interfere with rail operations, the court held that New York's regulation did not amount to the *regulation* of rail transportation.  *Id.  See also Franks Inv. Co.*, 593 F.3d at 409–10 (en banc) (also holding that the regulation of railroad crossings

does not constitute "transportation" where there is no interference with the movement of passengers or property).

Courts have also rejected a definition of "transportation" that would include those activities that merely increase the efficiency of the movement of passengers or property, but which are not essential thereto.  In *Del Grosso*, the First Circuit vacated the Board's finding that local regulation of certain transloading[7] activities conducted by a railroad – the vacuuming, screening, bagging, and palletizing of wood pellets by a rail carrier for transportation by rail – was categorically preempted.  *Del Grosso*, 804 F.3d at 118.  The Board had held that "although those activities were 'not essential' to transporting wood pellets by rail, they 'facilitate[d]' such transportation by making it 'more efficient,'" and therefore constituted transportation under the ICCTA.  *Id.* at 115–16.  The First Circuit rejected this overbroad construction of "transportation," however, holding that the Board "fail[ed] to relate the wood pellet facility's activities to the physical 'movement of passengers or property,' as opposed to cost efficiency."  *Id.* at 119.  Indeed, the Tenth Circuit has found that such an expansive interpretation of the ICCTA would lead to patently absurd results: permitting a railroad to "dispose of a

---

[7] Transloading is defined as the transferring of shipments from one type of vehicle to another, and therefore generally constitutes "transportation."  *See* 49 U.S.C. § 10102(9)(B) (Addendum 3) (defining "transportation" as including the "receipt, delivery . . . storage, handling, and interchange" of property).

dilapidated engine in the middle of Main Street" merely because it involved the disposition of railroad equipment related to the movement of passengers or property. *See Emerson*, 503 F.3d at 1132 (finding that the disposal of railroad ties into a drainage ditch was not related to the movement of passengers or property, and did not constitute rail transportation).

2. States May Not Impose "Preclearance" or "Permitting" Requirements That May Deny the Railroad the Ability to Conduct Operations Authorized by the Board

The second form of categorically preempted public health and safety regulation is where, by imposing a "permitting" or "preclearance" requirement, a state may deny the railroad the ability to conduct operations that have been authorized by the Board. *See City of Auburn v. United States*, 154 F.3d 1025 (9th Cir. 1998) (categorically preempting environmental permitting that could prevent a railroad from constructing, acquiring, operating, abandoning, or discontinuing a line); *Green Mt. R.R. Corp.*, 404 F.3d at 642 (categorically preempting construction permitting that restricted the railroad from development until a permit was issued, did not clearly establish requirements that the railroad could consult to assure compliance, and was dependent on the discretion of local officials); *Soo Line R.R. Co. v. City of Minneapolis*, 38 F. Supp. 2d 1096, 1101 (D. Minn. 1998) ("The Court concludes that the City's demolition permitting process upon which Defendants have relied to prevent [the railroad] from

28

demolishing five buildings . . . that are related to the movement of property by rail is expressly preempted by the [ICCTA].").[8]

### C. State Regulation Is Permissible If It Does Not Unreasonably Burden or Interfere With Interstate Rail Transportation

Public health and safety regulation that is not categorically preempted under either of the two narrow doctrines summarized above is permissible, so long as it is not unreasonably burdensome. *N.Y. Susquehanna*, 500 F.3d at 253; *see also Green Mt. R.R. Corp.* 404 F.3d at 642 (recognizing states' "traditional police powers . . . at least to the extent that the regulations protect public health and safety, are settled and defined, can be obeyed with reasonable certainty, [and] entail no extended or open-ended delays . . . ."). As the Third Circuit explained –

> As for the unreasonably burdensome prong, the most obvious component is that the substance of the regulation must not be so draconian that it prevents the railroad from carrying out its business in a sensible fashion. In

---

[8] Although NSR argued that SB 135 was akin to the type of local permitting or preclearance requirements typically found to be preempted by the Board and many Federal courts, the Board did not render its decision on that basis. "[I]n dealing with a determination or judgment which an administrative agency alone is authorized to make, [the Court] must judge the propriety of such action solely by the grounds invoked by the agency." *Riffin*, 592 F.3d at 198 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). Nevertheless, there is clearly no mechanism in SB 135 "that, by its nature, could be used to *deny* a railroad the ability to conduct some part of its operations or to proceed with activities that the Board has authorized." *See* Board Decision at 3 (J.A. 88) (emphasis added); *c.f. Green Mt. R.R. Corp.* 404 F.3d at 642 (finding preemption where the railroad was restrained from development until a permit is issued, the requirements for the permit were not clearly established; and the issuance of a permit was subject to the broad discretion of state and local officials).

> addition, as the *Green Mountain* Court held, regulations
> must be settled and definite enough to avoid open-ended
> delays. The animating idea is that, while states may set
> health, safety, and environmental ground rules, those
> rules must be clear enough that the rail carrier can follow
> them and that the state cannot easily use them as a pretext
> for interfering with or curtailing rail service.

*N.Y. Susquehanna*, 500 F.3d at 254 (internal citations omitted).

Under this standard, courts have regularly held state and local nuisance law to be a permissible exercise of traditional police powers, so long as the enforcement of such laws would not unreasonably burden transportation. In the context of locomotive idling, courts have rejected railroads' claims of preemption when the court "[could not] conclusively find that the idling of trains was *necessary* to CSX's railroad operations." *Smith v. CSX Transp., Inc.*, No. 14 C 5704, 2015 U.S. Dist. LEXIS 8931, at *6–7 (N.D. Ill. Jan. 27, 2015). On the other hand, courts have found preemption where defendant railroads have demonstrated that a "nuisance claim . . . *would* interfere directly with day-to-day railway operations." *Guckenberg v. Wisc. Cent. Ltd.*, 178 F. Supp. 2d 954, 959 (E. D. Wis. 2001) (emphasis in original).

The key principle underlying all of the cases cited above, no matter the particular fork of the preemption analysis, is that the ICCTA "does not categorically sweep up all state regulation that touches upon railroads – *interference with rail transportation must always be demonstrated*." *Island Park*,

30

559 F.3d at 104 (emphasis added). To the extent that the Board purports to have demonstrated such interference *at all* in this case, it has done so arbitrarily and capriciously, and without substantial evidence.[9]

## III. THE BOARD WAS ARBITRARY AND CAPRICICOUS IN CONCLUDING THAT SB 135 WAS CATEGORICALLY PREEMPTED UNDER THE ICCTA

As *Del Grosso*, *Island Park*, and *Franks* demonstrate, only the regulation of activities that are related to the movement of passengers and property by rail are categorically preempted under the ICCTA. SB 135 applies, literally, only to the *non-movement* of passengers and property by rail that, with no concomitant benefit to the railroad apart from mere convenience, seriously jeopardizes the health and welfare of Delaware's citizens. The activity addressed by SB 135 does not therefore constitute the "regulation of rail transportation," and the Board erred in finding that it was categorically preempted. *See Smith*, 2015 U.S. Dist. LEXIS 8931, at *3 (declining to apply a per se rule to preempt efforts to limit unnecessary locomotive idling); *Guckenberg*, 178 F. Supp. 2d at 959 (same). Moreover, the Board held that SB 135 was categorically preempted without fulfilling its obligation to draw a rational connection between the activity actually addressed by

---

[9] As the petitioner, NSR had the burden of proof in the Board proceeding. *City of Lincoln v. Surface Transp. Bd.*, 414 F.3d 858, 862 (8th Cir. 2005)); *Union Pac. R.R. Co.*, STB Finance Docket No. 35504, *slip op.* at 6 n.11 (Service Date Apr. 30, 2013) (citing 5 U.S.C. § 556(d) (Addendum 1).

SB 135 and the statutory definition of "rail transportation." *See Tex. Cent. Bus. Lines Corp. v. City of Midlothian*, 669 F.3d 525, 530 (5th Cir. 2012) ("Whether a particular activity constitutes transportation by rail carrier under section 10501(b) is a case-by-case, fact-specific determination.") (quoting *Town of Babylon*, STB Finance Docket No. 35057, *slip op.* at 4 (Service Date Feb. 1, 2008)).

### A.   SB 135 is Narrowly Tailored to Protect Public Health and Safety, While Avoiding the Regulation of Rail Transportation

#### 1.   SB 135 Does Not Regulate Transportation

SB 135 is specifically tailored to limit only non-essential idling that is, by definition, *not* "related to the movement of passengers or property."[10]  Specifically, SB 135 broadly exempts from the definition of "non-essential idling" any that is connected to–

(1)    Traffic conditions;

(2)    The direction of a law enforcement officer;

(3)    The operation of defrosting, heating, or cooling equipment to ensure the health or safety of the driver or passenger;

(4)    The operation of the primary propulsion engine for essential work-related mechanical or electrical operations other than propulsion; [or]

---

[10] SB 135 does not *directly* limit the movement of passengers or property; it applies only to idling, defined as the "the operation of the locomotive while it is stationary."  Del. Code Ann. tit. 21, § 8502(1) (Addendum 5); *see also* Am. Heritage Dictionary (2d ed. 1982) (defining stationary as "not moving.").

> (5)     Required maintenance, servicing, repairing, diagnostics, or inspections.

Del. Code Ann. tit. 21, § 8503(b) (Addendum 5).  SB 135 does not apply outside the hours of 8:00 p.m. and 7:00 a.m., or in areas that are zoned for industrial use (*i.e.*, the railroads' yards, maintenance facilities, and other areas where residents are unlikely to be impacted).  Del. Code Ann. tit. 21, § 8503(a), (c) (Addendum 5). These exemptions were built into SB 135 precisely to ensure that SB 135 applies only to idling that results in significant public health costs, without attempting to manage or govern aspects of rail transportation related to the movement of passengers and property.  In this way, SB 135 is framed with reference to the impact that non-essential idling on the surrounding residents, and not rail transportation.  It is therefore clear that Delaware seeks only to limit non-essential idling that has a deleterious public health effect, without attempting to "regulate rail transportation" more broadly.  *See Island Park*, 559 F.3d at 104 (noting that the Court must consider what the state seeks to regulate in deciding whether state action is expressly preempted under the ICCTA).

That SB 135 addresses activity that is only conducted by a railroad – idling locomotives – is not enough to bring that activity within the statutory definition of "transportation" under the ICCTA.  First, courts have recognized that states are often forced to regulate a matter of public concern separately with respect to railroads in order "to steer clear of a preemption problem."  *N.Y. Susquehanna*, 500

F.3d at 256.  Certainly, it would be unreasonable to hold idling locomotives to the same noise ordinance standards as a nightclub or neighborhood house party.  In such cases, it is not only permissible but appropriate to enact legislation establishing separate standards for railroads.  *Id.*

Second, courts and the Board have spoken clearly that regulation of activity that is not related to the movement of passengers or property is not categorically preempted under the ICCTA.  The Board's jurisdiction over the construction of railroad lines, for example, is exclusive; yet, the Board recognizes the ability of state and local governments to prohibit construction activities where such prohibitions would not burden transportation, *i.e.* "dumping excavated earth into local waterways."  *Id.* at 253 (citing *Auburn and Kent*, *slip op.* at 6); *see also Emerson*, 503 F.3d at 1132.  The Board's jurisdiction over "property . . . related to the movement of passengers or property . . . by rail" such as rail crossings is exclusive; yet, the Board recognizes the ability of state and local governments to close them where it would not burden transportation.  Neither of these activities seeks to regulate nor impacts the movement of passengers or property.  *See Island Park*, 559 F.3d at 104; *Franks*, 593 F.3d at 409–10.  SB 135 is similarly directed at an activity that may appear to fall within the definition of rail transportation, but does not because it applies *only* to a narrow subset of that activity that has no

connection to the movement of passengers or property by rail.  Locomotive idling is no different in this regard from excavation or railroad crossings.

Third, that an activity may make the movement of passengers or property more efficient or convenient is not enough to bring it within the definition of "rail transportation."  *See Del Grosso*, 804 F.3d at 119 (holding that a wood pellet facility's activities failed to relate to "the physical 'movement of passengers or property,' as opposed to cost efficiency").  Although NSR presented to the Board three examples of ways in which locomotive idling may be related to the movement of passengers or property, none of NSR, CSXT, or AAR ever argued that SB 135 would actually limit the activities that NSR described.[11]  Indeed, the *real* reason that NSR opposes SB 135 appears to be merely to avoid inconvenience.  *See* NSR Petition at 2–3, 9 (J.A. 4–5, 11) (noting that the only actual consequence of shutting an engine down for more than four hours when it does not need to be running is a "time-consuming and complex" air test).  Delaware does not deny that SB 135 will limit some instances of locomotive idling that the Railroads might otherwise choose to perform.  However, any resulting inconvenience is clearly insufficient to bring the activity limited by SB 135 within the statutory definition of "transportation."  *See Del Grosso*, 804 F.3d at 119

---

[11] As discussed below, moreover, all of NSR's examples appear to fall within SB 135's exceptions and therefore do not show that SB 135 regulates rail transportation.  *Infra* at 38–39.

(noting that the activity at issue would have allowed the railroad to transport twenty more tons of product per car).

The plain language of SB 135 indicates that it is narrowly tailored to restrict only locomotive idling that does not have a transportation purpose, and which does not impact the movement of passengers or property.  Whether SB 135 might incidentally interfere with the efficiency of the railroads' operations "goes beyond the statute and is beside the point."  *See id.* at 118.

### 2. Courts Have Refused to Apply a Per Se Rule in Cases Involving Unnecessary Locomotive Idling

Delaware's protection of its citizens in their homes by narrowly restricting only *unnecessary* locomotive idling is also consistent with cases addressing such conduct.  Where individual plaintiffs have challenged a railroad's unnecessary idling under nuisance law, courts have refused to apply a per se rule that would preempt all state and local regulation of locomotive idling without regard to its connection to rail transportation.  In *Smith*, 2015 U.S. Dist. LEXIS 8931, at *2, plaintiffs claimed that locomotives idling near their residence for prolonged periods had caused them to suffer from sleep deprivation, headaches, and other illnesses.  CSXT moved to dismiss the negligence action, arguing that such claims were preempted under the ICCTA.  *Id.* at *3.  While the court recognized the ICCTA's "broad and sweeping" preemption, it rejected CSXT's position that the claims were necessarily preempted; the court "[could not] conclusively find that

36

the idling of trains was *necessary* to [CSXT'S] railroad operations." *Id.* at \*6–7 (emphasis added).

In reaching this holding, the *Smith* court distinguished *Guckenberg*, where plaintiffs' nuisance claim was predicated on locomotive idling and other noises emanating from a side track built to increase the capacity of a rail yard critical to the railroad's operation. *See Guckenberg*, 178 F. Supp. 2d at 959. There, on the railroad's motion for summary judgement, the *Guckenberg* court found that "the nuisance claim in [that] case . . . *would* interfere directly with day-to-day railway operations." *Id.* (emphasis in original).

Taken together, these cases illustrate that efforts to limit unnecessary locomotive idling are not preempted merely because they involve the operation of locomotives. Rather, courts have found preemption under the ICCTA only where there is evidence to support a factual finding that the idling at issue is necessary to railroad operations. Here, however, the Board took the contrary position that "rules targeting unnecessary idling . . . would likely be preempted, even if [the] rules address activity that 'has *no* transportation purpose.'" Board Decision at 5 (J.A. 90) (quoting *U.S. EPA*, *slip op.* at 9) (emphasis added). The Board's decision clearly goes beyond the ICCTA by applying a categorical rule to what is necessarily a fact-bound inquiry. *See Tex. Cent. Bus. Lines Corp.*, 669 F.3d at 530.

37

**B.     The Board Failed to Draw a "Rational Connection" Between SB 135's Narrowly Tailored Limitations on Nocturnal Idling and the Statutory Definition of "Transportation"**

> 1.   The Board Had No Factual Basis to Conclude That SB 135 Regulates Rail Transportation Under the ICCTA

The Board's categorical preemption of SB 135 rests on the sweeping conclusion that just because *some* instances of idling are related to the movement of passengers or property and constitute rail transportation, *any* limitation on idling necessary regulates rail transportation. This is precisely the type of absurdity that the Tenth Circuit warned of in *Emerson. See* 503 F.3d at 1132 (noting that such reasoning would permit a railroad to "dispose of a dilapidated engine in the middle of Main Street" merely because it involved railroad equipment); *see also Del Grosso*, 804 F.3d at 118 ("[N]ot all activities connected with rail transportation are considered 'transportation' under the statute.").

Citing only the three examples offered by NSR, the Board concluded that SB 135 "clearly pertains to activity that is part of 'transportation by rail carriers.'" Board Decision at 4 (J.A. 89). But the Board's logic is faulty. NSR had proposed that locomotive idling may be important in "maintaining the air line to ensure the proper functioning of the braking system, preventing damage to the train when temperatures drop or are projected to drop below 35 degrees Fahrenheit, or addressing unforeseen circumstances such as train crew shortages or scarce rail capacity." *Id.* (citing NSR Petition, Ex. A (J.A. 20–24)). Assuming *arguendo* that

38

these examples are related to the movement of passengers or property, each of them appears to fall within SB 135's exemptions for idling that is the result of "traffic conditions . . . [t]he operation of the primary propulsion engine for essential work-related mechanical or electrical operations other than propulsion . . . [or] [r]equired maintenance, servicing, repairing, diagnostics, or inspections." *See* Del. Code Ann. tit. 21 § 8503(b) (Addendum 5). Indeed, the Board did not conclude – and with no evidence submitted by the Railroads, it could not have concluded[12] – that SB 135 would limit any of activities described by NSR. Without such a finding, the Board's logical syllogism is incomplete. If, after all, Delaware has succeeded in narrowly tailoring SB 135 to avoid the regulation of idling that is related to the movement of passengers or property, then how can SB 135 be construed as directly managing and governing rail transportation?

The Board's answer to this question – that "Delaware has purported to determine for the railroad which operations are essential and which are not" – underscores the Board's abdication of its responsibility under the APA. The Railroads do not determine the scope of preemption under the ICCTA. That is the responsibility of the Board. Yet, rather than consider the narrowly-tailored nature

---

[12] In fact, NSR's failure to meet its burden of proof on this key issue should have compelled the Board to deny the petition in the first instance. *See City of Lincoln*, 414 F.3d at 862.

of SB 135, or provide even a single example of a circumstance in which SB 135 would actually interfere with the physical movement of passengers or property, the Board deferred entirely to the Railroads' unproven assertion that "an instance of idling that the state deems 'non-essential' *may* in fact be important from an operational standpoint." Board Decision at 4 (J.A. 89) (emphasis added). Not only did NSR fail to meet its burden of proof with respect to this finding, but, even if it were true, it falls short of the connection to "transportation" required to establish categorical preemption: only state and local laws which directly and indiscriminately target aspects of rail transportation related to the movement of passengers or property are *categorically* preempted.

### 2. Contrary to the Board's Assertion, Prior Cases Do Not Address Narrowly Tailored Public Health and Safety Laws Such as SB 135

Although the Board attempts to draw support for its sweeping construction of "transportation" in prior decisions involving the regulation of locomotive idling, none address regulations narrowly tailored such as SB 135 to limit only non-essential activities. Rather, both decisions cited by the Board – *South Coast* and *U.S. EPA* – analyze a much broader regulatory scheme than that established by SB 135, and involve a markedly different evidentiary showing by the laws' challengers.

In *Ass'n of Am. R.R. v. S. Coast Air Quality Mgmt. Dist.*, No. CV 06-01416, 2007 U.S. Dist. LEXIS 65685 (C.D. Cal. Apr. 30, 2007), *aff'd* 622 F.3d 1094

40

(9th Cir. 2010), AAR sought to enjoin the enforcement of state regulations that imposed detailed reporting requirements and broadly regulated emissions from idling trains as a source of air pollution *without* regard to whether activities were necessary for rail operations.  The rules required Railroads to limit train idling to no more than thirty minutes in certain circumstances, unless they had either equipped their locomotives with anti-idling devices that would automatically shut down the train, or submitted an "emissions equivalency plan" for approval by the local government.  *Id.* at *10. Additionally, all railroads were required to "prepare and submit multiple railyard emissions inventory reports and health risk assessments . . . [and] notify the public of the contents . . . ."  *Id.* at *10–11.  There, the court specifically found, "based on the testimony and evidence presented at trial[,] that the activities of the Railroads which are regulated by the Rules have a transportation purpose."  *Id.* at *21 n.7.

In contrast to the rules at issue in *South Coast*, SB 135 is narrowly tailored to address only unnecessary idling.  SB 135 does not impose any reporting requirements on the railroads, require particular locomotive equipment, or seek to limit the overall idling of locomotives operating within Delaware.  Because the Board is required to conduct "a case-by-case, fact specific determination" as to whether a particular regulated activity constitutes rail transportation, the precedential value of any one analysis is limited.  *See Tex. Cent. Bus. Lines Corp.*,

41

669 F.3d at 530.  But, here, there is virtually no valid comparison to be drawn. SB 135 is narrowly-tailored to limit only that activity that does *not* "have a transportation purpose," *S. Coast*, 2007 U.S. Dist. LEXIS 65685 at *21 n.7. Indeed, Delaware internalized the essential holding of *South Coast* in drafting SB 135, and took careful steps to avoid such wholesale regulation of railroad operations.  To the extent that *South Coast* has any bearing whatsoever on this case, it is only to highlight the Board's failure to conduct a "case-by-case, fact specific" analysis and rationally conclude that the activity limited by SB 135 constitutes rail transportation.

The Board's decision in *U.S. EPA* is even less on point.  There, the Board was asked to consider whether *the very same laws* at issue in *South Coast* could be harmonized with Section 10501(b) (Addendum 3) if they were incorporated into the California State Implementation Plan (SIP) by the EPA under the Clean Air Act, and thereby given the force and effect of *federal* law.  Thus, not only was the regulation at issue quantitatively different from that which is at issue here, *see U.S. EPA*, *slip op.* at 9 (finding that the regulation "appears to . . . influence the railroads' choice of equipment and how to configure that equipment"), but the legal question before the Board was also entirely different.  Moreover, the Board did not even *issue* a declaratory order, finding that, until the EPA had actually approved and incorporated the rules into SIP, such a decision would be premature.

42

What the Board *did* say, however, drives *U.S. EPA* and *South Coast* even further from the situation now before the Court. In issuing "guidance summarizing the relevant court and agency case law on the nature and extent of [ICCTA] preemption and how it *might* apply to the incorporation of the Rules into the California SIP," the Board "did not suggest that every existing federal regulation that may affect railroad operations is preempted by [the ICCTA]." *Id.* at 10 (emphasis added). Rather, the Board specifically left open the possibility that the EPA may be able to "take steps to avoid creating a unworkable array of regulations." *Id.* The Board went only so far as to suggest that "it *appears* allowing states and localities to create a variety of *complex* regulations governing how an instrument of interstate commerce is operated, equipped, or kept track of (even if federalized under the CAA) would directly conflict with . . . national regulation of rail transportation." *Id.* (emphasis added).

These cases stand in stark contrast to the Board's cursory dismissal of SB 135, with virtually no discussion of the law's actual impact on rail transportation. Such treatment falls short of what the APA demands, and what the citizens of Delaware affected by unnecessary nocturnal locomotive idling deserve.

43

## IV.  THE BOARD WAS ARBITRARY AND CAPRICIOUS IN CONCLUDING THAT SB 135 UNREASONABLY BURDENS AND INTERFERES WITH RAIL TRANSPORTATION

The Board's assertion that SB 135 would also be preempted "as-applied" because it unreasonably burdens and interferes with rail transportation also violates the APA.  "For state or local actions that are not facially preempted, the section 10501(b) preemption analysis requires a factual assessment of whether that action would have the effect of preventing or unreasonably interfering with railroad transportation."  *Franks*, 593 F.3d at 413 (quoting *CSX Transp.*, *slip op.* at 4); *see also Auburn and Kent*, *slip op.* at 8 ("A key element in the preemption doctrine is the notion that only 'unreasonable' burdens, i.e., those that 'interfere with' Federal authority, or 'unreasonably burden' interstate commerce, are superseded."); *Blissfield*, 550 F.3d at 541 ("The touchstone of this analysis is whether the state regulation imposes an unreasonable burden on railroading.") (internal quotations omitted).

Ordinarily, the Board's "unreasonable burden" test is fact-intensive, counseling the courts of appeals' "narrow review."  *City of Lincoln.*, 414 F.3d at 860–61.  However, the Court may not accept the Board's finding where, as here, it is unsupported by substantial evidence.  *See Tubbs v. Surface Transp. Bd.*, 812 F.3d 1141, 1144 (8th Cir. 2015).  Because the Board had *no* evidence upon which to base its conclusion that SB 135 unreasonably burdened rail transportation, and

44

because it based its decision on irrelevant factors, this matter should be remanded for further fact-finding.

### A.    The Board Lacked Substantial Evidence to Conclude That SB 135 Unreasonably Burdens and Interferes With Rail Transportation

Neither the Railroads nor the Board made any effort to identify the actual burden that SB 135 would place on rail transportation, much less assess whether that burden, if any, was reasonable in light of the harms it was designed to mitigate.  As discussed previously, the Board cited only three specific examples of when a railroad may choose to idle its locomotives: when it is parked with attached train cars, in order to maintain the air lines throughout the train; due to unforeseen circumstances such as train crew shortages or scarce rail capacity, so as to avoid restart delays; and when the temperature falls below thirty-five degrees Fahrenheit, to prevent damage to the train.  NSR Petition at 2–3 (J.A. 4–5).

NSR did not argue, however, that any of these examples would fall outside of the objective contours of essential locomotive idling not restricted by SB 135. Instead, when Delaware first raised NSR's omission, NSR responded that "the impact of the statute on [NSR's] operations is totally irrelevant."  NSR Response at 4 (J.A. 47).  NSR made no effort to further describe the burden imposed by SB 135, if any, or to balance that burden against Delaware's interest in protecting the welfare of its citizens.  Similarly, AAR argued that "the Board need not assess the impact of [SB 135] on rail operations," and made no effort to address it.  AAR

Reply at 4 (J.A. 81).  While CSXT made a conclusory allegation that SB 135 would "significantly burden operations in Delaware," it also made no effort to support its statement, or balance the alleged burden against harm Delaware's interest or that of its citizens.  *See* CSX Reply at 2–4 (J.A. 50–52).

Given that NSR had the burden of proof with respect to the "unreasonableness" of SB 135's impact on rail transportation, *see City of Lincoln*, 414 F.3d at 862, yet failed to introduce *any* evidence as to its impact or the reasonableness thereof, it is practically inconceivable that the Board would resolve this disputed fact in its favor.  Yet that is exactly what the Board did.  The Board did not consider that SB 135 applies only in areas not zoned for industrial use, broadly exempting idling that may occur in rail yards and many customer transloading facilities.  *See* Del. Code Ann. tit 21, § 8503(c) (Addendum 5).  The Board did not consider that SB 135 applies only at night, when the public health risks are the most pronounced.  *See* Del. Code Ann. tit 21, § 8503(a) (Addendum 5). And the Board did not consider the wide range of legitimate locomotive idling beyond the reach of SB 135.[13]  *See* Del. Code Ann. tit 21, § 8503(a) (Addendum 5).

---

[13] Moreover, it would appear that there is ample latitude for railroads to curtail unnecessary idling before it would unreasonably burden railroad operations. In *Township of Woodbridge*, STB Finance Docket No. 42053 (Service Date Dec. 1, 2000), for example, Conrail entered into a voluntary agreement to curtail unnecessary locomotive idling for noise abatement.  *See also S. Coast*, 2007 U.S.

Given the complete omission of evidence that SB 135 would impact railroad operations, let alone unreasonably burden them, the Board's conclusion in this regard was patently erroneous. *See N.Y. Susquehanna*, 500 F.3d at 256 (remanding to the district court where the Board failed to develop a record adequate to support a finding as to reasonableness of each regulation's burden on rail transportation individually).

### B.     Instead of Balancing the Harms, the Board Arbitrarily and Capriciously Concluded SB 135 Was Preempted as Applied

Rather than balance Delaware's interest and that of its citizens against the railroads' interest in unnecessarily idling its locomotives for purposes unrelated to rail transportation, the Board rested its conclusion on two aspects of SB 135 so common that they are shared with virtually every conceivable state regulation: it is enforced by local police officers, and it only applies within the state. *See* Board Decision at 5 (J.A. 90). Neither is an adequate basis for finding SB 135 preempted as applied.

---

Dist. LEXIS 65685 at *24 (noting that the Railroads "had already entered into agreements with different states and districts regarding their operations"). Since it is not reasonable to assume that the railroads would voluntarily subject themselves to an unreasonable burden, clearly there exists some category of unnecessary idling that SB 135 may permissibly curtail.

1.  SB 135 Does Not Impermissibly Vest Discretion in Local Law Enforcement

Within the realm of permissible state and local regulation, courts have recognized that it would be "impractical" not to permit vesting any discretion at all in local law enforcement officers. *N.Y. Susquehanna*, 500 F.3d at 254. Rather, states must simply take care that discretion not "(1) be so open-ended as to all but ensure delay and disagreement, or (2) actually be used unreasonably to delay or interfere with rail carriage." *Id.* SB 135 does not implicate either concern.

The criteria exempting locomotive idling that serves a legitimate transportation purpose are clear and objective, not "open-ended." If a railroad is approached by a law enforcement officer, the railroad can readily demonstrate the purpose of its idling. The law enforcement officer is not called upon to make a subjective determination as to whether a particular instance of idling is essential or not. Moreover, SB 135 does not give the officer any authority to detain the train, order the locomotive shut down, or otherwise interfere with the train's operation. Rather, a law enforcement officer encountering a locomotive that is not idling for a transportation purpose may only issue a fine for the offense.[14] Del. Code Ann.

---

[14] "Nothing prevents a state from imposing a significant fine" for noncompliance with otherwise valid regulations, as long as the fine is not unreasonable. *N.Y. Susquehanna*, 500 F.3d at 255. SB 135 imposes a fine between $5,000 and $10,000 for the initial offense, and between $10,000 and $20,000 for each offense thereafter. Del. Code Ann. tit. 21, § 8505 (Addendum 6). There is nothing in the record "demonstrating the (un)reasonableness of this

tit. 21, § 8505 (Addendum 6). In the event of a disagreement between the railroad and the police officer, there is no risk that railroad operations will be delayed, and the railroad may seek review of the assessed fine in the Delaware Superior Court. *See* Del. Code Ann. tit. 21, § 8504 (Addendum 5).

Accordingly, SB 135 does not, as the Board suggests, "[a]llow[] local officials to make . . . judgments on operational necessity," Board Decision at 5 (J.A. 90), and there is no risk of unreasonable interference with railroad operations. The role of local law enforcement is limited to issuing a citation. If that mere fact were enough to preempt state and local regulation "as applied," there would be no room for any state and local regulation whatsoever. The issue is not whether the law is enforced with the discretion of law enforcement officers, but rather whether the discretion unreasonably burdens rail transportation. To the extent that the Board held SB 135 preempted on this basis, it was therefore clearly arbitrary and capricious.

### 2. The Possibility of a "Patchwork" of Regulations, Standing Alone, is Insufficient to Preempt State and Local Law

The Board's second stated basis – that the "potential patchwork of regulations . . . could result in a railroad's being subject to several different and possibly conflicting state and local regulations as it crosses state lines," Board Decision at 5 (J.A. 90) – is similarly faulty. Delaware does not dispute that

amount (and the [Board] cites nothing)." *N.Y. Susquehanna*, 500 F.3d at 255.

Congress intended to establish a generally uniform set of rules applicable to interstate rail transportation. However, the Board impermissibly elevates the underlying rationale of the ICCTA preemption doctrine into a definitive legal test. If it were true that the mere possibility that each jurisdiction could adopt different and conflicting rules was enough to preempt regulation as applied, there would be no room whatsoever for state and local regulation. This is clearly not the case. *See Green Mt. R.R. Corp.*, 404 F.3d at 643 (finding building, fire, electrical, and plumbing codes not preempted, even though they are frequently different across jurisdictions). Congress was not concerned with a "patchwork" of non-burdensome state and local regulation that did not impact the movement of passengers or property, but rather with the imposition of materially different standards that would make interstate operation a practical impossibility.

Nothing cited by the Board is to the contrary. *South Coast* and *U.S. EPA*, as discussed above, involved "a variety of complex regulations governing how an instrument of interstate commerce is operated, equipped, or kept track of" that is substantially different in magnitude from the minimal limitation imposed by SB 135. *U.S. EPA*, *slip op.* at 10. Those cases did *not* hold, as the Board asserts, that all "rules targeting unnecessarily idling . . . [were] 'exactly the type of local regulation Congress intended to preempt . . . .'" *See* Board Decision at 5 (J.A. 90) (quoting *S. Coast*, 2007 U.S. Dist. LEXIS 65685, at *23–24). Rather, they held

50

only that the rules at issue in *those* cases – rules that sought to broadly control emissions from idling locomotives within the state and impose substantial administrative burdens on collecting and reporting on emissions data – were intended to be preempted. In fact, in comparing the regulations at issue in *South Coast* and *U.S. EPA* to "local speed restrictions and quiet zones where horn blowing is restricted," the Board distinguished the latter from the "patchwork" problem by noting the ease with which railroads can comply: "Quiet zones are simply marked by signs, and speeds are given in timetables that crews can easily follow." *U.S. EPA*, *slip op.* at 10. Compliance with SB 135 is even easier: the railroad need simply ask whether a locomotive must be idling and, if the answer is "no," turn it off.

In the absence of a finding that SB 135 constitutes an unreasonable burden on railroad operations, standing alone, it is inappropriate to invalidate SB 135 merely because other jurisdictions may also act within their permissible police powers to protect the welfare of their citizens without unduly interfering with rail transportation. The Board lacked substantial evidence to support that finding in this case, and this Court must vacate and remand.

## CONCLUSION AND RELIEF SOUGHT,
## AND REQUEST FOR ORAL ARGUMENT

For the foregoing reasons, the Petitioner respectfully requests the Court to

grant the Petition for Review, and schedule the case for oral argument.

Respectfully submitted this 25th day of July, 2016.


_____/S/_____

W. Eric Pilsk
epilsk@kaplankirsch.com
Allison I. Fultz
afultz@kaplankirsch.com
Steven L. Osit
sosit@kaplankirsch.com
KAPLAN, KIRSCH & ROCKWELL, LLP
1001 Connecticut Avenue, NW
Washington, D.C.  20036
Telephone:  (202) 955-5600
Facsimile:  (202) 955-5616


Counsel to State of Delaware

Jennifer R. Noel
Jennifer.Noel@state.de.us
Deputy Attorney General
DELAWARE DEPARTMENT OF
  JUSTICE
Carvel State Building
820 N. French Street, SLC C600
Wilmington, DE 19801
(302) 577-8400

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 28(a)(11) and 32(a)(7)(C), I hereby certify on this 25th day of July, 2016, that:

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    ☑   this brief contains 12,402 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    ☐   this brief uses a monospaced typeface and contains [state the number of] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☑   this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 v.14 in 14 point Times New Roman Font, *or*

    ☐   this brief has been prepared in a monospaced typeface using Microsoft Office Word 2010 v.14 with [state number of characters per inch and name of type style].

     /s/_____
W. Eric Pilsk
Attorney for Petitioner State of Delaware

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 25th day of July, 2016, I electronically filed the foregoing BRIEF OF PETITIONER STATE OF DELAWARE with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

\_\_\_\_\_/s/_____
W. Eric Pilsk
Attorney for Petitioner State of Delaware

CASE NOT YET SCHEDULED FOR ORAL ARGUMENT

CASE NO. 16-1121

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

STATE OF DELAWARE,
Petitioner,

v.

SURFACE TRANSPORTATION BOARD and the
UNITED STATES OF AMERICA,
Respondent.
_____

**ADDENDUM OF STATUTES AND REGULATIONS TO
BRIEF OF PETITIONER STATE OF DELAWARE**
_____

Review of STB Order; Petition of Norfolk Southern Railway Company,
STB Finance Docket No. 35949 (Service Date Feb. 22, 2016)
_____

W. Eric Pilsk
epilsk@kaplankirsch.com
Allison I. Fultz
afultz@kaplankirsch.com
Steven L. Osit
sosit@kaplankirsch.com
KAPLAN, KIRSCH & ROCKWELL, LLP
1001 Connecticut Avenue, NW
Washington, D.C.  20036
Telephone:  (202) 955-5600
Facsimile:  (202) 955-5616

Counsel to State of Delaware

Jennifer R. Noel
Jennifer.Noel@state.de.us
Deputy Attorney General
DELAWARE DEPARTMENT OF
  JUSTICE
Carvel State Building
820 N. French Street, SLC C600
Wilmington, DE 19801
(302) 577-8400

# INDEX TO ADDENDUM OF STATUTES AND REGULATIONS

**Page**

5 U.S.C. § 556(d) ...................................................................................1

5 U.S.C. § 706.........................................................................................2

49 U.S.C. § 10102(9) ..............................................................................3

49 U.S.C. § 10501(b) ..............................................................................3

Del. Code Ann. tit. 21, § 8501 ...............................................................4

Del. Code Ann. tit. 21, § 8502 ...............................................................4

Del. Code Ann. tit. 21, § 8503 ...............................................................5

Del. Code Ann. tit. 21, § 8504 ...............................................................5

Del. Code Ann. tit. 21, § 8505 ...............................................................6

**5 U.S.C. 556(d)**

(d) Except as otherwise provided by statute, the proponent of a rule or order has the burden of proof. Any oral or documentary evidence may be received, but the agency as a matter of policy shall provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence. A sanction may not be imposed or rule or order issued except on consideration of the whole record or those parts thereof cited by a party and supported by and in accordance with the reliable, probative, and substantial evidence. The agency may, to the extent consistent with the interests of justice and the policy of the underlying statutes administered by the agency, consider a violation of section 557(d) of this title sufficient grounds for a decision adverse to a party who has knowingly committed such violation or knowingly caused such violation to occur. A party is entitled to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross- examination as may be required for a full and true disclosure of the facts. In rule making or determining claims for money or benefits or applications for initial licenses an agency may, when a party will not be prejudiced thereby, adopt procedures for the submission of all or part of the evidence in written form.

**5 U.S.C. 706**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

(1)  compel agency action unlawfully withheld or unreasonably delayed; and

(2)  hold unlawful and set aside agency action, findings, and conclusions found to be--

    (A)  arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

    (B)  contrary to constitutional right, power, privilege, or immunity;

    (C)  in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

    (D)  without observance of procedure required by law;

    (E)  unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

    (F)  unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

2

**49 U.S.C. § 10102(9)**

(9)  "transportation" includes--

 (A)  a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and

 (B)  services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property; and


**49 U.S.C. § 10501(b)**

(b)  The jurisdiction of the Board over--

 (1)  transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

 (2)  the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,

is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

**Del. Code Ann. tit. 21, § 8501**

**8501. Purpose**

The General Assembly finds and determines that the people of this State are entitled to and should be ensured an environment free from the effects of nonessential idling of locomotives between 8 p.m. and 7 a.m., as such nonessential idling degrades the quality of their life, property, and environment.

**Del. Code Ann. tit. 21, § 8502**

**8502. Definitions**

(1) "Idling" means the operation of the locomotive while it is stationary.

(2) "Law-enforcement officer" means a sworn member of a police force or other law-enforcement agency of this State, or of any county or municipality within this State, who is responsible for the prevention and detection of crime and the enforcement of the laws of this State, or the laws of any county or municipality within this State.

(3) "Person" means a company, corporation, association, firm, partnership, joint venture, or other legal entity. "Person" does not include individuals.

**Del. Code Ann. tit. 21, § 8503**

**8503. Nonessential idling prohibited; defined**

(a) No person may permit the nonessential idling of a locomotive under its control or on its property between 8 p.m. and 7 a.m.

(b) Idling is nonessential if it is not a result of 1 or more of the following circumstances:

(1) Traffic conditions.

(2) The direction of a law-enforcement officer.

(3) The operation of defrosting, heating, or cooling equipment to ensure the health or safety of the driver or passenger.

(4) The operation of the primary propulsion engine for essential work-related mechanical or electrical operations other than propulsion.

(5) Required maintenance, servicing, repairing, diagnostics, or inspections.

(c) This section does not apply within the boundaries of property zoned for industrial activity by the county or municipality having jurisdiction over the property.


**Del. Code Ann. tit. 21, § 8504**

**8504. Enforcement**

(a) Any law-enforcement officer in whose jurisdiction the locomotive, or any car attached to a locomotive, is located may enforce this chapter.

(b) The Superior Court shall have exclusive jurisdiction over offenses under this chapter.

**Del. Code Ann. tit. 21, § 8505**

**8505. Penalties**

Any person who violates this chapter shall be punished by a fine of not less than $ 5,000 nor more than $ 10,000 for the first offense and not less than $ 10,000 nor more than $ 20,000 for each subsequent offense.